IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CHARLES T. BURD, et al.,

      Plaintiffs,

v.                           Case No.:  3:13-cv-20976

FORD MOTOR COMPANY,

      Defendant.


## MEMORANDUM OPINION and ORDER

Pending before the Court is Plaintiffs' Motion to Challenge Confidential Designation and to Compel. (ECF No. 242). Defendant Ford Motor Company ("Ford") has filed a memorandum in opposition to the motion, (ECF No. 259), and Plaintiffs have replied. (ECF No. 266). Plaintiffs' motion involves a four-page document produced by Ford in the course of discovery, (ECF No. 240-1), which Ford now seeks to "clawback" as a privileged communication between attorney and client. On April 1, 2015, the undersigned heard oral argument on the motion and, after ruling that the document was indeed a privileged communication, took under advisement the issue of whether Ford's production of the document was an inadvertent disclosure subject to clawback under Federal Rule of Evidence 502(b), or constituted a waiver of the privilege. Having fully considered the facts and the relevant law, the Court finds that Ford's production of the document was an inadvertent disclosure and Ford took reasonable steps to both protect

the document prior to production and to retrieve it once Ford learned it had been mistakenly produced. Accordingly, Plaintiffs' Motion to Challenge Confidential Designation and to Compel is **DENIED**.

## I.    Relevant Facts

These cases involve alleged events of sudden unintended acceleration in certain Ford vehicles manufactured between 2002 and 2010.  In particular, Plaintiffs claim that their vehicles were equipped with defective Electronic Throttle Control ("ETC") systems which were not fault tolerant, resulting in open throttle events during which the drivers of the vehicles lacked the ability to control the throttles. Plaintiffs assert that the mechanisms causing the throttles to open unexpectedly were numerous; included electromagnetic interference, resistive shorts, and other voltage and resistance fluctuations; and these issues were known to Ford. However, despite having knowledge of the potential for sudden unexpected acceleration, Ford failed to properly design the ETC system to correct the events when they occurred, and further neglected to install fail-safes, such as a Brake Over Accelerator system, that would allow the drivers to physically prevent or mitigate sudden acceleration.

In addition to the instant action, Ford is a defendant in cases pending in various state courts where drivers of Ford vehicles have alleged events of sudden unintended acceleration. Much of the discovery requested by plaintiffs in the state actions mirrors the discovery requested by Plaintiffs in these cases. In 2009, Ford designated an attorney, Jodi Munn Schebel, to serve as National Discovery Counsel for Ford on cases involving allegations of sudden unintended acceleration. (ECF No. 259-2 at 1). In 2012, Ford collected documents potentially responsive to discovery requests concerning its 2010 development of a Brake Over Accelerator system ("the BOA documents"). (*Id.* at 1-

2). Included in the BOA documents was a four-page "Question and Answer" sheet prepared by Ford's media department, which addressed concerns related to sudden unexpected acceleration. The "Q&A" sheet was triggered by a highly-publicized, large-scale vehicle recall by Toyota Motor Company after several of its vehicles were implicated in fatal crashes thought to be connected with events of sudden, unintended, and uncontrollable acceleration. Anticipating that Toyota's situation would open the floodgates of media attention on the issue of unintended acceleration, Ford decided to prepare for the inquiries. Once a Q&A sheet was drafted, the document was circulated to a handful of Ford employees for review and comment. Included in that group of employees was Jay Logel, an attorney in Ford's Office of the General Counsel. (ECF No. 259-2 at 2). Mr. Logel reviewed the document and made substantive alterations to the answers, providing commentary and explanations with many of the proposed changes. (ECF No. 240-1). Mr. Logel's revision of the draft Q&A sheet ("the Logel document") is the document at issue in Plaintiffs' motion. At least one other version of the Q&A sheet without Mr. Logel's comments is included in the BOA documents. This Q&A sheet is neither designated as privileged, nor is the subject of a clawback effort.

After the BOA documents were collected, they were provided to Xerox, Ford's discovery vendor, for processing, maintenance, and subsequent production. (ECF No. 259-2 at 2). Xerox made the BOA documents available for pre-production review by Ford's litigation counsel on a review platform, where they were examined by Ms. Schebel in late 2012 for both relevancy and privilege. (*Id.*). During the review, Ms. Schebel identified the Logel document as relevant, but also as privileged. Therefore, she designated the Logel document as privileged, indicating to Xerox with that designation that the Logel document was to be withheld from production in its entirety. (*Id.*). After

3

examining all of the BOA documents, Ms. Schebel created a privilege log that included the Logel document. (*Id.*).

Thereafter, Ford produced the BOA documents as part of larger document productions in three separate lawsuits pending in various courts across the country. On October 16, 2014, Ford produced the BOA documents to Plaintiffs in this action as part of a rolling production of documents. (ECF No. 259-2 at 2). On October 23, 2014, Ford supplied Plaintiffs with a copy of the privilege log, which included the Logel document by description and Bates number. (*Id.* at 3). On November 11, 2014, Plaintiffs requested the deposition of several Ford employees, including Said Deep, a press spokesperson for Ford who was listed as the contact person on the Q&A sheet.

On January 29, 2015, the Court entered a Clawback Order. (ECF No. 211). The order states in relevant part:

> The inadvertent disclosure of a document subject to a claim of privilege or of protection as trial-preparation material, including electronically stored information ("ESI"), shall not constitute a waiver of any privilege claim or protection to that document if (a) the holder of the privilege or protection took reasonable steps to prevent disclosure and (b) the holder promptly took reasonable steps to rectify the error. For purposes of this Order, the term "promptly" shall mean within 14 days of the discovery of the inadvertent disclosure.

(ECF No. 316 at 1). On February 3, 2015, Plaintiffs served Ford with Requests for Admission. (ECF No. 242-7). Some of the requests specifically addressed topics and statements contained in the Logel document and referenced the date the draft Q&A sheet was transmitted to Mr. Logal for review and comment. In addition, Plaintiffs requested the depositions of several employees involved in revising the Q&A sheet, including Jay Logel. (ECF No. 242 at 3).

4

On Sunday, February 15, 2015, an attorney for Ford, Mr. Tracy Walker, was preparing to defend the deposition of Said Deep by reviewing all documents produced by Ford that mentioned Mr. Deep's name. (ECF No. 259-3 at 1). During this process, Mr. Walker came across the Logel document. Noting that the document had been labeled "privileged and confidential" and contained advice and comments from Ford's in-house counsel, Mr. Walker immediately notified Ms. Schebel of his discovery. (*Id.* at 2). After learning that the Logel document may have been produced with the BOA documents, Ms. Schebel confirmed that the Logel document was included on the privilege log and was designated to be withheld as a privileged communication. (ECF No. 259-2 at 3). The following day, Ms. Schebel informed Plaintiffs' counsel in this action, and in the three other cases in which the BOA documents had been produced, that the Logel document had been inadvertently disclosed. (*Id.*). Ms. Schebel requested that Plaintiffs immediately return the document pursuant to the Court's Clawback Order.

Ms. Schebel then contacted Xerox to determine how the Logel document had been produced despite its privilege designation. Ultimately, Xerox advised that a processing error on its part caused the privilege designation to be stripped from the Logel document during preparation for production, resulting in its inadvertent disclosure. (*Id.*). Ms. Schebel subsequently learned that ten other privileged documents contained in later productions were subject to a similar processing error and were erroneously disclosed. A written notification and request for clawback was immediately issued on those documents as well. (*Id.*). According to information supplied by Xerox to Ford's counsel, Ford has produced 26,244 documents in this litigation as of March 20, 2015, and eleven documents have been identified as being affected by the processing error. (*Id.* at 4).

## II.   <u>Discussion</u>

Plaintiffs argue that the Logel document is not privileged, because it is not a communication between attorney and client for the purpose of requesting and receiving legal advice. Ford argues to the contrary, asserting that the comments by Mr. Logel are plainly intended as legal advice and are labeled by him as "privileged and confidential." Ford supplies for *in camera* review a companion e-mail sent by Mr. Logel with the revised Q&A draft, which Ford contends will substantiate its position. Plaintiffs respond that even if the Logel document is privileged, Ford waived the privilege by producing the document and allowing Plaintiffs a substantial amount of time to use it in preparation of their case. In particular, Plaintiffs served Requests for Admission based upon the Logel document and have also used the document as the basis for specific allegations in their amended complaint. Regardless, Ford maintains that its production of the Logel document was inadvertent and, under Fed. R. Evid. 502(b) and the Court's Clawback Order, the production does not waive the attorney-client privilege.

### A.  *The Logel Document is a Privileged Communication*

As a preliminary matter, the Court must consider which forum's law to apply. The rule for matters of privilege in federal court is found at Fed. R. Evid. 501, which provides, *inter alia*, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Here, the substantive claims and defenses are largely matters of state law;[1] accordingly, it follows that any inquiry into whether the Logel document is privileged as a confidential attorney-client communication is a question of state law. However, given that the instant action

---

[1] Plaintiffs have asserted an alleged violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; however, the vast majority of the allegations involve violations of individual state consumer protection, trade practices, and warranty acts.

involves claims from multiple states that have been consolidated for discovery, the choice of which state law to apply is not obvious. Conceivably, the law of all twenty-two[2] involved states could or should be consulted. Plaintiffs choose to resolve the dilemma by citing to the law of West Virginia, the state in which this Court sits, and to federal law, and Ford did not object to that approach. Certainly, in cases of complex litigation, federal courts have analyzed the applicability of the attorney-client privilege using federal law despite the language of Rule 501. *See In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d, 789, 795 (E.D.La. 2007). Another option is to apply the law of the state with the most significant relationship to the communication. *See In re Yasmin & Yaz (Drospirenone) Mktg, Sales Practices & Prods. Liab. Litig.,* No. 3:09-md-02100-DRH-PMF, 2011 WL 1375011, at *9 (S.D.Ill. Apr. 12, 2011) (citing Section 139 of the Restatement (Second) of Conflict of Laws (1971)). In this case, that state would presumably be Michigan as the employees involved in the communication were in Ford's corporate headquarters located in Michigan. Fortunately, the federal law of privilege and the laws of West Virginia and Michigan are compatible.

Both West Virginia and Michigan recognize that not all communications between an attorney and his or her client are privileged. Instead, the privilege attaches only to communications made for the purpose of obtaining legal advice. *State v. Burton,* 254 S.E.2d 129, 135 (W.Va. 1979); *see also State ex rel. Montpelier U.S. Ins. Co. v. Bloom*, 757 S.E.2d 788, 794 (W.Va. 2014) ("In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal advisor; (3) the communication

---

[2] Twenty-three states are involved in the proposed amended complaint.

between the attorney and client must be intended to be confidential."); *also Ravary v. Reed,* 415 N.W.2d 240, 243 (Mich.App. 1987) ("[T]he attorney-client privilege attaches to communications made by a client to his or her attorney acting as a legal adviser and made for the purpose of obtaining legal advice on some right or obligation."). "Confidential client communications, along with opinions, conclusions, and recommendations based on those communications, are protected by the attorney-client privilege because they 'are at the core of what is covered by the privilege.'" *McCartney v. Attorney General,* 587 N.W.2d 824, 830 (1998), quoting *Hubka v. Pennfield Twp.,* 494 N.W.2d 800, 802 (1992). Because the attorney-client privilege prevents the disclosure of otherwise relevant information, the privilege is narrow in scope. *Reed Dairy Farm v. Consumers Power Co.,* 576 N.W.2d 709, 711 (Mich.App. 1998). Moreover, "the burden of establishing the attorney-client privilege or the work product exception, in all their elements, always rests upon the person asserting it." *State ex rel. U.S. Fid. and Guar. Co. v. Canady,* 460 S.E.2d 677, 684 (W.Va. 1995).

Similarly, under federal law, "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (citing 8 Wigmore, *Evidence* § 2292 (McNaughton rev. ed.1961)). The privilege "does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered." *Deseret Mgmt. Corp. v. United States,* 76 Fed.Cl. 88, 90 (2007) (quoting *Pac. Gas & Elec. Co. v. United States,* 69 Fed.Cl. 784, 810 (2006)). Under federal law, there is a presumption that communications between a client and his or her attorney are for the purposes of requesting legal guidance, *Yankee Atomic Elec. Co. v. United States,* 54 Fed.Cl. 306, 315 (2002), although that presumption may not

extend to communications with a corporation's in-house counsel when counsel also holds an executive position with the company. *See, e.g., United States v. ChevronTexaco Corp.,* 241 F.Supp.2d 1065, 1076 (N.D.Cal. 2002). Much depends upon the role of the attorney in the organization. *See Boca Investerings P'ship v. United States,* 31 F.Supp.2d 9, 12 (D.D.C. 1998) ("There is a presumption that a lawyer in the legal department or working for the general counsel is most often giving legal advice, while the opposite presumption applies to a lawyer ... who works for the Financial Group or some other ... management or business side of the house."). Under federal law, the party asserting the privilege bears the burden of establishing its applicability. *AAB Joint Venture v. United States,* 75 Fed.Cl. 448, 456 (2007)).

Plaintiffs maintain that the Logel document is not privileged because the communications were not made for the purpose of giving or receiving legal advice. According to Plaintiffs, Jay Logel was one of several employees asked to provide comments on a media-related document. Consequently, when Mr. Logel responded, his suggestions were nothing more than business advice. However, it is clear to the Court after conducting an *in camera* review of Ford's Exhibit D[3] that the communications contained in the Logel document constitute legal advice. At the time Mr. Logel was asked to review the Q&A sheet, Ford was already involved in litigation related to unintended accelerations. In addition, the massive Toyota recall had the real potential of expanding litigation exposure to Ford, while creating an industry-wide liability issue. Exhibit D corroborates Ford's assertion that Mr. Logel was consulted in his role as an attorney because of ongoing and potential litigation, and his comments were intended to convey the legal perils and liabilities to Ford associated with making certain statements

---

[3] Exhibit D was not available to Plaintiffs due to its privileged content.

in light of the litigation.

Plaintiffs argue that even if the Logel document contains legal advice, portions of the document are still subject to disclosure to the extent that the portions relay facts. Plaintiffs contend that a fact does not become privileged simply because a client reveals it to his lawyer; therefore, while Mr. Logel's advice may be subject to redaction, his statements of fact should be produced. Although Plaintiffs are correct that "the attorney-client privilege 'extends only to communications and not to facts,'" it does not follow that the inclusion of facts in an attorney-client communication is fatal to the privilege that accompanies the communication. *Continental Casualty Co. v. Amer. Home Assur. Co.,* Civil Action No.: 2:00-0260, 2010 WL 692942, at *5-6 (S.D.W.Va. Feb. 23, 2010) (quoting *State ex. rel. United Hosp. Center, Inc. v. Bedell,* 484 S.E.2d 199, 209 (W.Va. 1997)). As this Court explained in *Continental Casualty,* a client may not be compelled to disclose what he said or wrote to his attorney, but the client may be compelled to disclose a relevant fact within his knowledge regardless of whether he communicated that fact to his attorney. However, that is not the circumstance here. In this case, facts are discussed by the attorney as an essential part of his advice. When factual material is incorporated in an attorney-client communication, and the factual material is "an integral part of the overall communication," the *entire communication* remains privileged, including the factual content. *Id.* at 6. That is not to say that the privilege cloaks the facts under a blanket of non-disclosure; instead, the facts are protected only to the extent that they appear in and are an integral part of the privileged communication. This is so because attorneys give advice based upon certain factual scenarios. Thus, the attorney-client privilege is designed to protect "not only the giving of professional advice to those who can act on it but also the giving of information to the

lawyer to enable him to give sound and informed advice." *Upjohn Company v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant."). Nevertheless, the client may not refuse to disclose the same factual material if it appears in an unprivileged document, or is available through the testimony of a witness, because the facts, by themselves, are not privileged.

In the instant action, the Logel document contains some factual statements. The statements are made by Mr. Logel to explain the reasons for his advice. As such, the factual information is integral to the overall communication. Undoubtedly, the facts stated by Mr. Logel would have been communicated to him in his role as an attorney for Ford. This exchange of factual information between corporate employees and the corporation's lawyer in the course of providing legal advice is privileged. *Id.* at 395-96. However, Plaintiffs are not precluded from deposing corporate employees to discover their personal knowledge of the same facts. *Id.* at 396.

### B.  Ford did not Waive the Privilege by Inadvertent Production

While the applicability of the privilege is governed by state law, waiver of the privilege is a matter of federal law. Fed. R. Evid. 502(f); *See, also, Seyler v. T-Systems North America, Inc.,* 771 F.Supp.2d 284, 287-88 (S.D.N.Y. 2011) ("Unlike the scope of the privilege, the waiver question is governed by Federal Rule of Evidence 502(a), which applies when a 'disclosure is made in a Federal Proceeding.'"). Rule 502 addresses the consequences that flow from the intentional or inadvertent disclosure of a privileged communication. Under Rule 502(b), when a privileged communication is accidently disclosed in a federal proceeding, the disclosure will not act as a waiver of the privilege if

three conditions are met: (1) the disclosure is inadvertent; (2) the holder of the privilege took reasonable steps to prevent disclosure; and (3) the holder of the privilege promptly took reasonable steps to rectify the error. "All three prongs of Rule 502(b) must be met in order to find that a disclosure of a privileged or protected document does not result in a waiver." *Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 444 (D.Md. 2012) (citing *U.S. Home Corp. v. Settlers Crossing, LLC,* No. DKC 08–1863, 2012 U.S. Dist. LEXIS 101778, at *29, 2012 WL 3025111 (D.Md. July 23, 2012)). The requirements of Rule 502(b) may be superseded by an agreement between the parties, or by a clawback order, but only to the extent "such an order or agreement [provides] concrete directives regarding each prong of Rule 502(b)— *i.e.,* (1) what constitutes inadvertence; (2) what precautionary measures are required; and (3) what the privilege holder's post-production responsibilities are to escape waiver." *Id. (*citing *Mt. Hawley Ins. Co. v. Felman Prod., Inc.,* 271 F.R.D. 125, 130, 133 (S.D.W.Va. 2010)). In areas where the order or agreement lacks specifics, Rule 502(b) will control.

There is no serious dispute that Ford's production of the Logel document was inadvertent.[4] Furthermore, Plaintiffs concede that Ford acted promptly and reasonably to rectify the error once it was discovered. Indeed, the Clawback Order entered by the Court allows the producing party fourteen days after discovery of the error to issue a written notification and seek clawback. Ford accomplished these tasks in twenty-four hours. Nevertheless, Plaintiffs argue that neither Rule 502(b), nor the Clawback Order,

---

[4] Plaintiffs claim that Ford has not carried its burden to establish that production of the Logel document was inadvertent given that Ford has not provided any evidence of the processing error that resulted in the document's disclosure, other than an affidavit from Ms. Schebel stating than an error occurred. The undersigned does not find this argument persuasive. In addition to the affidavit of Ms. Schebel, the Court notes that the Logel document was included on Ford's privilege log. Moreover, according to an affidavit from Mr. Walker, co-counsel for Ford, as soon as he realized that the Logel document was included in a set of produced documents, he contacted Ms. Schebel. This call was made on a Sunday evening. The following day, Ms. Schebel issued written clawback requests. This evidence, taken as a whole, corroborates Ford's representation to the Court that disclosure of the Logel document was inadvertent.

protects Ford from its waiver of the privilege because (1) Ford did not act reasonably to protect the Logel document from disclosure in the first place, and (2) fairness and justice demands waiver. The Clawback Order does not include any concrete terms explaining what precautions must be taken to meet the reasonableness standard in the second prong of Rule 502(b); therefore, the Court will rely on Rule 502(b) to fill in the gaps.

According to the Advisory Committee Notes to Rule 502(b), multiple factors should be considered in determining whether the attorney-client privilege is waived by an inadvertent disclosure of a confidential communication. A five-factor test is often used in this circuit, *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 250 F.R.D. 251, 259 (D.Md. 2008), and a similar test has been adopted in the Sixth Circuit. *See Evenflo Co. v. Hantec Agents Ltd.,* No. 3:05–CV–346, 2006 WL 2945440, *6 (S.D.Ohio Oct.13, 2006); *Fox v. Massey–Ferguson, Inc.,* 172 F.R.D. 653, 671 (E.D.Mich. 1995). In *Victor Stanley*, the Court balanced the following factors to decide whether the privilege was waived: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosures; (4) any delay in measures taken to rectify the disclosure; and (5) overriding interests in justice. *Id.* at 259. The Advisory Committee Notes to Rule 502(b) confirm that this type of multi-factor test is anticipated by the Rule, adding that "other considerations bearing on the reasonableness of the producing party's efforts include the number of documents to be reviewed and the time constraints for production." The Notes continue as follows:

> Depending on the circumstances, a party that uses advanced analytical software applications and linguistic tools in screening for privilege and work product may be found to have taken "reasonable steps" to prevent inadvertent disclosure. The implementation of an efficient system of records management before litigation may also be relevant.

13

The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake. But the rule does require the producing party to follow up on any obvious indications that a protected communication or information has been produced inadvertently.

*Id.*

Plaintiffs argue that Ford did not take reasonable steps to prevent inadvertent disclosure primarily because Ford's counsel did not review the documents after they were processed by Xerox, but before they were produced to plaintiffs in the four litigations. At the hearing, Ford's counsel explained the document collection and processing procedure as follows: Potentially relevant documents were gathered by Ford employees and sent to Xerox, where they were placed on a review platform. Ford's counsel then reviewed the documents on Xerox's platform and determined which were relevant. When examining the documents for relevancy, Ford's counsel simultaneously conducted a privilege review. Relevant documents were marked as such and were assigned a Bates-number range. The documents were electronically numbered within the range. Documents determined to contain privileged or protected communications were either redacted or designated as privileged in their entirety. Privileged documents were included on a privilege log, and Xerox was instructed to withhold from production all documents with a privilege designation. When Ford's counsel responded to document requests filed in individual cases and needed documents maintained by Xerox, counsel contacted Xerox and requested that documents in certain Bates-numbered ranges be prepared. Xerox would then load the identified documents onto a CD and provide the CD to Ford's counsel for production. For the most part, in order for Ford's counsel to review the CD prior to producing it, counsel would have to load the CD

into a database, or load file, that could read the CD's formatting. However, the CD containing the BOA documents was not formatted for a separate load file and could have been reviewed simply by inserting it into any computer's CD drive. The BOA production CD contained approximately 2,700 total documents, including the Logel document.

Going through the factors in the *Victor Stanley* test, Plaintiffs point out that Ford originally collected the documents in 2012. Accordingly, there was a substantial amount of time for Ford's counsel to have checked the Xerox-processed documents for errors prior to producing them in October 2014. Plaintiffs also stress that the production containing the Logel document was not particularly large. According to Plaintiffs, although Ford argues that it has produced over 26,000 documents in the litigation, the particular production involving the Logel document was relatively small, including only 2,700 documents. Plaintiffs claim that the disclosure in this case was complete and extensive when considering that Plaintiffs had the entire Logel document for four months and based written discovery, requests for depositions, and litigation strategy on statements contained in the document. Plaintiffs argue that it is too late for Ford to "unring the bell." They maintain that the Logel document has become intrinsic to their case, and they should not be expected to unlearn what they now know. Finally, Plaintiffs maintain that it is both unfair and contrary to the interests of justice to allow Ford to clawback the Logel document. For one thing, Plaintiffs assert that Ford had many opportunities to realize its mistake soon after the Logel document was disclosed and thus could have corrected the error before Plaintiffs came to rely on the document. For example, Plaintiffs indicate that they requested Said Deep's deposition within a few weeks of receiving the Logel document. Ford's counsel expressed confusion regarding the request in view of Mr. Deep's role as a corporate spokesperson, yet apparently made

15

no effort to review the documents that had been produced with references to Mr. Deep. Had Ford taken this simple step, the inadvertent disclosure would have been found months earlier. Even after receiving requests for admission derived from the Logel document and a request for Jay Logel's deposition, it was still nearly two weeks before Ford recognized its mistake. In addition, Plaintiffs claim that justice will be impeded unless the privilege is deemed to be waived. Plaintiffs argue that the factual admissions made by Mr. Logel are crucial to their case. Ford has denied requests for admission based specifically on the statements in the Logel document, and despite Plaintiffs' efforts, they have not found comparable admissions in any of the other documents produced by Ford. Consequently, in Plaintiff's view, justice requires the document to be disclosed.

### 1.  Reasonableness of precautions

The first factor in most multi-factor tests is whether the disclosing party took reasonable precautions to protect the confidential communication from disclosure. Plaintiffs rely heavily on this Court's analysis in *Mt Hawley Insur. Co. v. Felman Prod., Inc.,* 271 F.R.D. 125 (S.D.W.Va. 2010) for their assertion that Ford's failure to perform a quality control review of the BOA documents processed by Xerox prior to producing them was unreasonable. Although the analysis in *Mt. Hawley* offers constructive guidance, the Court disagrees that the conclusions reached in that case are transferrable to the present circumstance given the fundamental differences in their factual scenarios. In Mt. Hawley, potentially relevant electronically stored information ("ESI") was collected based upon pre-selected search terms, and then potentially privileged documents were culled and separated based upon another set of search terms. The remaining 346 gigabytes of ESI was produced without being reviewed by anyone and

16

without sampling for relevancy, over-inclusiveness, or under-inclusiveness. *Id.* at 135. As a result, thirty percent of the million-page production was determined to be "junk," and at least 377 privileged documents not harvested by the search terms were disclosed. Some of these documents were listed on a privilege log, and some were not listed. Some of these documents were the focus of clawback efforts, and some were not, largely depending upon whether the adverse party had brought the issue to the attention of Felman Production, Inc. ("Felman"), the party producing the ESI. To make matters worse, Felman had stamped every document in the 346-gigabyte production as "Confidential," regardless of whether the document deserved that designation. Moreover, after learning of the inadvertent disclosure of privileged documents, Felman was slow to respond and failed to retrieve all copies. In finding that Felman did not undertake reasonable precautions to protect the privileged documents, the Court was particularly impressed with Felman's indifference and rather sloppy approach to the discovery process. Felman's failure to test the reliability of the word searches, its gross overproduction of irrelevant materials, and the substantial number of privileged documents that were disclosed were all key factors in the Court's conclusion that the privilege was waived. *Id.* at 136.

In contrast, there is no issue here regarding the adequacy of search terms, the failure to sample collections, or the lack of an "eyes-on" review of the documents prior to their production. To the contrary, there was a two-tiered review. First, employees of Ford collected all potentially germane documents and forwarded them to Xerox. Second, the documents were reviewed by an attorney, who confirmed the relevancy of the documents and identified, redacted, and designated privileged and protected materials. This type of review is common and generally accepted as reasonable. *See U.S.*

17

*ex rel. Bagley v. TRW, Inc.,* 204 F.R.D. 170, 179 (C.D.Cal., 2001) ("A two-layer system of pre-production review—in which relatively ministerial determinations are made by employees of the producing party or by clerks, paralegals, or inexperienced associates employed by a law firm, and in which the final decision about what documents should or should not be produced is made by experienced in-house or outside lawyers—is not unusual."). As the Court in *Bagley* noted, "[i]n  addition to providing meaningful protection for privileged documents, such an approach reduces the transaction costs of litigation by allowing individuals with less experience and training ... to perform the most time-consuming and routine tasks. Punishing defendant for adopting this common, reasonable, and cost-effective strategy would not make sense." *Id.; see also BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, Nos. 09 Civ. 9783(RWS), 09 Civ. 9784(RWS), 2013 WL 2322678, at *5 (S.D.N.Y. May 21, 2013) (finding that the process of collecting documents, loading them into an online document review platform maintained by an external vendor, and having attorneys review prior to production was a common practice previously considered by courts to be reasonable); *Jacob v. Duane Reade, Inc.,* No. 11 Civ. 0160(JMO)(THK), 2012 WL 651536, at *4 (S.D.N.Y. Feb. 28, 2012) (finding that reasonable measures were employed where defendants hired "an outside vendor to host the electronic data retrieved. They then retained a team of between ten and fifteen contract attorneys, working under the supervision of a Project Manager and litigation counsel ... [and] prepared lists of names and attorneys whose communications should be privileged, employed search filters, and quality control reviews."). The glitch that resulted in the inadvertent disclosure of the Logel document occurred after the "eyes-on" attorney review, when the selected documents were being prepared by a vendor. Courts, considering disclosures due to processing errors that

18

occurred after attorney review, selection, and segregation of confidential materials, have emphasized that the core element of the first factor is the reasonableness of the review procedure, not the precision of post-review processing. *See, e.g., Heriot v. Byrne,* 257 F.R.D. 645, 660 (N.D.Ill. 2009). In *Heriot,* much like the present case, highly confidential documents were disclosed through a post-review processing error by a document vendor. The error was not recognized until two months later when the producing party was preparing for a deposition. The following day, the producing party issued a notice and attempted to clawback the privileged documents. Finding that the inadvertent production was not a waiver of the privilege, the Court stated, "[p]laintiffs had no duty to re-review the documents after providing them to the Vendor. That would be duplicative, wasteful, and against the spirit of FRE 502. Additionally, imposing on disclosing parties a duty to re-review would chill the use of e-vendors, which parties commonly employ to comply with onerous electronic discovery." *Id. (*citations omitted); *see also D'Onofrio v. Borough of Seaside Park,* Civil Action No. 09–6220 (AET), 2012 WL 1949854, at *11 (D.N.J. May 30, 2012) (holding that the producing party had no duty to review document CD prepared by vendor to insure accuracy of production prior to supplying it to the requesting party). In *D'Onofrio,* after completing the review and designation process, the responsible attorney delegated to a non-attorney, clerical employee the task of separating the flagged documents from the remaining document production and sending the non-flagged, non-privileged information to a document vendor to be scanned onto a CD. The resulting CD was produced without prior review. Later, the producing party discovered that the CD erroneously contained several of the documents that had been flagged by the attorney as confidential. Finding that the producing party's failure to examine the CD prior to production was not unreasonable,

19

the Court explained:

> Indeed, as explicitly noted in FRE 502(b)'s Explanatory Note, "[t]he rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake." Thus, having implemented reasonable steps to prevent the inadvertent disclosure of privileged information, the Borough Defendants were permitted to rely on same, at least until there were "any obvious indications that a protected communication or information ha[d] been produced inadvertently." *Explanatory Note,* FRE 502(b).

Reasonable precautions are not necessarily foolproof. "Carelessness should not be inferred merely because an inadvertent production of privileged documents occurred. The reasonableness of the precautions adopted by the producing party must be viewed principally from the standpoint of customary practice in the legal profession at the time and in the location of the production, not with the 20–20 vision of hindsight." *U.S. ex rel. Bagley,* 204 F.R.D. at 179-80.

Having considered the steps taken by Ford to prevent disclosure of the Logel document, the undersigned finds that, while not perfect, the precautions taken by Ford fell within the range of reasonable. Therefore, this factor weighs in favor of preserving the privilege.

### 2.  Number of inadvertent disclosures

The second factor to consider is the number of inadvertent disclosures. Out of the 2,700 BOA documents produced, the Logel document is the only inadvertent disclosure. A single error is not extreme and certainly is not indicative of a lax process. Since learning of Xerox's error, Ford and Xerox have conducted an investigation of all of Ford's document productions and discovered that out of roughly 26,000 documents produced, ten additional documents fell victim to a similar processing error and were mistakenly disclosed. Even still, that total amounts to only four one hundredths of the

total production. Many courts would find this error rate to be well within a reasonable range. *See, e.g., In re Grand Jury Investigation,* 142 F.R.D. 276, 280-81 (M.D.N.C. 1992) (Production of 18 confidential documents out of 22,000 documents produced was not evidence of lax procedures); *Thermoset Corp. v. Building Materials Corp. of America*, No. 14–60268–CIV, 2015 WL 1565310, at *8 (S.D.Fla. Apr. 8, 2015) (One document out of 1,000 pages was not a basis for waiver); *Smith v. Allstate Ins. Co.,* 912 F.Supp.2d 242, 248 (W.D.Pa. 2012) (Production of seven documents containing privileged information out of 1,200 pages produced was considered a small number of inadvertent disclosures); *American Coal Sales Co. v. Nova Scotia Power Inc.*, No. 2:06–cv–94, 2009 WL 467576, at *17 (S.D.Ohio Feb. 23, 2009) (One inadvertent disclosure in 2,000 produced documents was not significant); *Lazar v. Mauney,* 192 F.R.D. 324, 330 (N.D.Ga. 2000) (the privilege was not waived when three privileged documents were included in a production of 1,000 documents); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y. 1985) (The inadvertent production of 22 privileged documents with 16,000 other documents did not result in waiver of privilege). Accordingly, this factor weighs in favor of preserving the privilege.

### 3. Extent of disclosure

The third factor refers to the degree to which inadvertently disclosed documents have "worked their way into the fabric of the case." *In re Grand Jury Investigation,* 142 F.R.D. at 281. "The concern of the court, and the reason for consideration of this factor, is whether any meaningful confidentiality can be restored." *Id.* Although Plaintiffs claim that the disclosure in this case was complete, and they have relied on the Logel document as a basis for discovery and deposition requests, for litigation strategy, and in formulating some of the allegations in their amended complaint, the document has not

21

been made a part of the record, or used in any deposition. Moreover, although Ford produced the Logel document in four different cases, the document reportedly has not been openly and explicitly incorporated in any of the other proceedings. Therefore, despite complete disclosure of the Logel document to Plaintiffs, disclosure has not occurred outside of the closed environment of discovery. For all practical purposes, the effect of the inadvertent disclosure can be greatly minimized, or even eliminated. The Logel document should be returned and not made a part of the record, provided to experts or used as a basis or their opinions, or tendered to witnesses during deposition and trial testimony. As such, the Logel document should have no affect on the outcome of the litigation. Consequently, this factor is neutral.

### 4.  Reasonableness of efforts to rectify error

The parties agree that there was no measurable delay on Ford's part in attempting to rectify the error once the mistake was known. Plaintiffs suggest that Ford should have realized its error sooner in view of some of its discovery requests, but this particular factor focuses on the actions of the producing party *after* it discovers the inadvertent disclosure. *See S.E.C. v. Badian,* No. 06 Civ. 2621 (LTS)(DFE), 2009 WL 222783, at *4 (S.D.N.Y. Jan. 26, 2009) (citing *Aramony v. United Way of America,* 969 F.Supp 226, 237 (S.D.N.Y. 1997); *Hawkins v. Anheuser-Busch, Inc.,* No. 2:05-cv-688 2006 WL 3230756, at *2 (S.D.Ohio June 19, 2006) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103 (S.D.N.Y. 1985); *Myers v. City of Highland Village, Texas,* 212 F.R.D. 324, 327 (E.D.Tex. 2003).

Here, Ford's counsel discovered the potential inadvertent disclosure of the Logel document on a Sunday evening. The following day, co-counsel confirmed the error and immediately sought clawback of the document by written notification and request to all

known recipients of the BOA documents. Therefore, this factor weighs in favor of preserving the privilege.

### 5. Justice and fairness

Finally, Plaintiffs believe that the Logel document supplies crucial factual information that they may not be able to duplicate through other evidence. Nonetheless, this type of consideration is not a factor in the waiver analysis. The overriding interests of fairness and justice "must not be confused with the benefit that the receiving party would enjoy from the waiver. Instead '[t]he prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties of pertinent information.'" *Nilaver v. Mercy Health Systems-Western Ohio*, No. 3:99cv612, 2004 WL 5345311, at *6 (S.D. Ohio Mar. 22, 2004) (quoting *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 446 (S.D.N.Y. 1995). Otherwise, the fifth factor "would always favor the receiving party." *U.S. ex rel. Bagley,* 204 F.R.D. at 184. Moreover, "in determining whether an inadvertent production of privileged material amounts to a waiver, the importance of the attorney-client privilege should not be ignored. ... A party to whom privileged documents are produced inadvertently, by contrast, has no inherent 'fairness' interest in keeping them, unless the producing party waited so long to address the problem after having been informed of it that the receiving party reasonably changed its position in reliance upon their continued availability." *Id.* at 181-82 (citing *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 174 (D.Kan.1989) ("Defendant fortuitously obtained the privileged documents. It could not have expected to obtain them and could not have reasonably relied on them. To the extent defendant did rely on them, it did so without plaintiffs' knowledge or consent.").

Although the length of time Plaintiffs had possession of the Logel document weighs somewhat in favor of waiver, there was no reason for Ford to suspect that the document had been produced by its vendor against the express instructions of Ford's litigation counsel until the document was discovered during deposition preparation. Plaintiffs' contention that Ford's counsel should have suspected disclosure when Ford received Plaintiffs' request for the deposition of Said Deep presumes a duty on Ford's counsel to immediately collect Mr. Deep's documents simply because his deposition was requested, even though it was not yet scheduled. That presumption is not realistic given the demands and time constraints of large-scale litigation, as well as the mutable demands made by parties during the discovery process. For these reasons, the undersigned finds this factor to be neutral.

## III.  <u>Conclusion</u>

Having found the Logel document to be privileged, the Court further finds that it was inadvertently disclosed through a vendor's error. The Court has analyzed the factors under Fed. R. Evid. 502(b) and the Clawback Order, and finds three factors to weigh in favor of preserving the privilege, while two factors are neutral. Therefore, the Court concludes that Plaintiffs' motion should be **DENIED,** and Ford is entitled to clawback the Logel document.

The Clerk is directed to provide a copy of this Order to counsel of record and any unrepresented party.

**ENTERED:** April 14, 2015

Cheryl A. Eifert
United States Magistrate Judge

24